**OUTTEN & GOLDEN LLP**
Gary Phelan (CT 03670 )
Outten & Golden LLP
Four Landmark Square, Suite 201
Stamford, CT 06901
(203) 363-7888
Fax: (203) 363-0333

Ira Burnim
Karen A. Bower
The Judge David L. Bazelon Center for Mental Health Law
1101 15th Street, NW,   Suite 1212
Washington, DC  20005
 (202) 467-5730
Fax: (202) 223-0409

FILED

2005 MAY 27  P 2: 14

U.S. DISTRICT COURT

**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**
-------------------------------------------------X
**C.D., as the next friend and mother of,**
**A.B.**

                    **Plaintiff,**

          **v.**

**THE ETHEL WALKER SCHOOL, INC.,**

                    **Defendant.**
-------------------------------------------------X

**Civil Action Number:**
**305CV0852**   **AWT**

**May 27, 2005**

## PLAINTIFF'S COMPLAINT

As and for their Complaint in the above-captioned action, Plaintiff, C.D. on behalf

of A.B., by and through their attorneys, Outten & Golden LLP and the Bazelon Center for

Mental Health Law, allege and state as follows:

### NATURE OF THE ACTION

1. A.B. was attending a private school which discriminated against her and forced her to

   take a medical leave of absence because the school perceived her to have a mental

disability, and because she had a record of having had a mental disability. Despite the assurance of the hospital that A.B. was fit to return to school and did not pose any danger to herself or others, the school refused to permit her to return and suggested instead, that she find a "therapeutic" school. The school also placed conditions on her re-admission not placed on students without a disability.

2. She brings this action under the Americans with Disabilities Act and Section 504 of the Rehabilitation Act of 1973 to recover damages which arose as a consequence of the school's discriminatory treatment, for declaratory judgment, for injunctive relief, and for reasonable attorneys' fees expended as a result of defending her rights.

3. C.D. also brings pendant state law claims, including breach of contract, invasion of privacy and negligent infliction of emotional distress.

## JURISDICTION AND VENUE

4. This court has jurisdiction pursuant to 42 U.S.C. § 12201 et. seq. and 28 U.S.C. §§ 1331, 1343.

5. This court has supplemental jurisdiction over Plaintiff's related claims arising under state and local laws pursuant to 28 U.S.C. § 1367(a).

6. Venue lies in this judicial district pursuant to 28 U.S.C. § 1391(b) as this action arose, in substantial part, within the District of Connecticut, where the unlawful activity alleged herein occurred and where many of the records pertinent thereto are maintained.

## PARTIES

7. A.B. is a minor residing in Connecticut. She resides with her mother, C.D.

8. C.D. is A.B.'s mother and legal guardian. She resides in Connecticut with her daughter, A.B.

2

9. The Ethel Walker School, Inc., is a Connecticut corporation which operates a private primary and secondary educational institutional with its principal place of business at 230 Bushy Hill Road, Simsbury, CT, 06070.  Upon information and belief, Ethel Walker is a recipient of federal funds. It is a covered entity under 42 U.S.C. § 12181, and 29 U.S.C. § 794, and is subject to Title III of the ADA and Section 504.

## FACTUAL ALLEGATIONS

10. A.B. is 15 years old.  She suffers from depression, and at times, has engaged in self-injury such as cutting.

11. "Cutting" is when someone cuts their own skin with a sharp object, usually glass or a razor blade; it is not typically linked to suicide or violence.  Rather, individuals typically engage in cutting to provide relief from psychological pain, tension reduction, trauma re-enactment, connection with or disassociation from feelings, connection with physical boundaries, rage expression, or a means of communication.

12. A.B. was a non-residential day student at the Ethel Walker School ("Walker School"), a private all-girls middle and secondary school located in Simsbury, Connecticut.  A.B. attended the Walker School until November 22, 2004.

13. A.B. is an excellent student with high grades.  She has many interests and was involved in several in-school and after-school activities at the Walker School.

14. From the winter through March 2004, while A.B. was in the eighth grade, C.D. noticed that A.B. was sullen, withdrawn and less communicative.  She asked Dr. Paula Chu, Director of Counseling at the Walker School, to speak with A.B. to assess her.

15. A.B. saw Dr. Chu for ongoing treatment from April 2004 until May 20, 2004. During those sessions, A.B. discussed her depression.

16. On May 20, 2004, A.B. disclosed that she had been self-injuring to Dr. Chu. Dr. Chu said that she would have to tell C.D. what A.B. had shared with her.

17. On May 21, 2004, Dr. Chu called C.D. at work, and learned that A.B. was home sick. Dr. Chu was concerned about A.B. and called her at home. In that conversation, A.B. admitted to taking 15 Tylenol and repeatedly throwing up.

18. The Walker School's 2003 - 2004 Student Handbook states:

> Should a student require immediate attention due to acute and/or extreme emotional difficulty, she should be referred to the Counseling Center. In the event that a student discusses the intention of hurting herself or someone else, or if she actually attempts to harm herself or someone else, the School requires that the student immediately undergo an evaluation by an outside professional.

19. Consistent with the Walker Student Handbook, Dr. Chu suggested that C.D. make an appointment for A.B. with an outside psychologist.

20. Later that same day, Dr. Chu called C.D. and insisted that prior to seeing an outside therapist A.B. should be evaluated to determine her mental status and be medically cleared.

21. At Dr. Chu's suggestion, C.D. took A.B. to the Connecticut Children's Medical Center for evaluation. On May 21, 2004, A.B. agreed to be admitted to the Institute of Living, a psychiatric care facility located in Hartford, Connecticut.

22. A.B. was discharged from the Institute of Living on May 28, 2004, seven days after she was admitted, and was medically cleared to return to school. The discharge plan included continuing under a therapist's care and taking Prozac.

23. Dr. Chu did not think A.B. should return to school, and encouraged her to agree to a medical leave of absence. Dr. Chu also suggested that A.B. see a long-term therapist.

24. It was very important to A.B. that she return to school and graduate from the middle school with her class. She did not agree to a medical leave of absence, but did begin seeing Dr. Gary Zachariah for weekly therapy.

25. A.B. returned to school on June 1, 2004 and graduated the eighth grade with her class on June 4, 2004.

26. C.D. gave consent to the Institute of Living to share information with Dr. Chu.

27. Neither A.B. nor C.D. authorized Dr. Chu to release any mental health information to Walker administration. However, at Dr. Chu's insistence, C.D. told Gwen Couch, Middle School Coordinator, that A.B. took an overdose of Tylenol and had been at the Institute of Living.

28. On June 20, 2004, Ms. Couch, sent C.D. a letter stating that she was very pleased that A.B. returned to school, however, she wanted to "underscore the importance to the School that [A.B.] continue to receive psychological support in an ongoing manner, both during the summer and for the fall." Ms. Couch also insisted that A.B. remain in therapy and contact Dr. Chu if she intended to discontinue therapy.

29. Without the permission of A.B. or C.D., this letter disclosing A.B.'s mental health treatment was sent to Susanna Jones, Head of School, Monica Phillips Nix, Dean of Studies, Elinor Abbe, Dean of Students, Paula Chu, Director of Counseling, Lee Zalinger, Advisor, and Joyce McIntyre, Director of Health Services.

30. From June to November, 2004, A.B. continued therapy with Dr. Zachariah. During these sessions, A.B. discussed her depression and self-injury.

31. C.D. signed the contract with the Walker School for the 2004-2005 academic year in March 2004. She received the 2004-2005 Student Handbook in approximately August 2005.

32. For the 2004-2005 school year, the relevant portion of the Student Handbook was changed. The new version required that, "In the event that a student expresses the intention of hurting herself or someone else, or if she actually attempts to harm herself or someone else, the School requires that the student take an immediate medical leave." The new Student Handbook does not indicate the length of the medical leave, but does contemplate an individualized assessment with "Terms of the leave and conditions for return…determined by the School, and include evaluation by a psychologist or psychiatrist."

33. At the time that C.D. enrolled A.B. for the 2004-2005 school year and signed the school contract, C.D. was not made aware of this revised manual and the mandatory medical leave provision.

34. A.B. began the next school year, and her first year of high school, at the Walker School on September 8, 2004.

35. On October 21, 2004, and again on October 28, 2004, Dr. Chu sent A.B. e-mails requesting a meeting to "check-in" and find out what kind of support A.B. was getting. On November 1, 2004, C.D. informed Dr. Chu that A.B. was seeing a therapist regularly.

36. A.B. maintained a private and anonymous, password-protected journal on the website www.blurty.com. This website hosts online journals for subscribers, and is a popular site for teenagers.

37. A.B.'s journal contained her private thoughts and feelings, and included references to A.B.'s self-injury, feelings of depression and worthlessness, and expressions that she wanted to die or that she would be better off dead.  In approximately July or August 2004, C.D. discussed some of A.B.'s journal entries with Dr. Zachariah.  Dr. Zachariah thought that it was helpful for A.B to write down how she felt.

38. Unbeknownst to either A.B. or C.D., sometime in mid-November 2004, friends of A.B. had figured out A.B.'s identity (username) and password, and copied several undated portions.

39. Concerned about A.B., her friends gave the journal entries to Johnnie Cook, their guidance counselor at the Watkinson School.  Mr. Cook did not know A.B. or C.D.  Mr. Cook called Dr. Chu to discuss the concerns raised by A.B.'s friends.

40. On November 15, 2004, Dr. Chu called C.D., raised concerns about A.B.'s mental health and asked C.D. for the name of A.B.'s therapist.  C.D. provided Dr. Zachariah's name.

41. That same day, Dr. Chu sent C.D. an e-mail stating that Dr. Chu  needed to communicate the information in the journal and her concerns regarding [A.B.]'s well-being to A.B.'s therapist. Dr. Chu further stated that given the information she received, she "must have clear assurances of [A.B.]'s therapist" that she did not need to implement the school policy requiring an immediate leave of absence.

42. In response, C.D. called Dr. Zachariah, and asked him to call Dr. Chu.  On November 16, 2004, C.D. signed a release, authorizing Dr. Zachariah "to talk with Dr. Paula Chu regarding [A.B.]'s state of mind."   The authorization was effective until the "current situation is resolved or November 22, whichever comes first."

43. On November 16 or 17, 2004, Dr. Zachariah spoke to Dr. Chu. and assured her that A.B. was in weekly therapy, which was going well.   Nonetheless, on Thursday, November 18, 2004, Dr. Chu faxed a copy of the journal pages to Dr. Zachariah.

44. Dr. Zachariah gave A.B. and C.D. copies of the journal and discussed the contents. Dr. Zachariah was concerned about the traumatizing psychological effect on A.B. of the invasion of her privacy and the dissemination of her journal to others, including Dr. Chu and the Walker School. He stated that A.B. may need more extensive therapy and even possibly hospitalization.  He insisted that she go to Connecticut Childrens' Medical Center for a more extensive assessment than he could provide.

45. That evening, C.D. took A.B. for an assessment.  Dr. Zachariah called Dr. Chu to let her know that A.B. would not be in school on Friday, November 19, 2004.

46. On the evening of Friday, November 19, 2004, A.B. was admitted to the CAPS (Child and Adolescent Program) on the Mt. Sinai campus of St. Francis Hospital for evaluation.

47. The Walker School was closed from Monday, November 22, 2004 through Friday, November 26, 2004 for Thanksgiving vacation.

48. Before the release of information expired, Dr. Chu called Dr. Zachariah over the weekend and on Monday, November 22, 2004, to find out where A.B. was.  Dr. Zachariah informed Dr. Chu that A.B. was at St. Francis Hospital.

49. Neither A.B. nor C.D. gave Dr. Chu authorization to disclose A.B.'s mental health information to Ms. Abbe or any other Walker School administration official.  Nor did C.D. herself inform the Walker School administration that A.B. was in the hospital.

50. On Monday, November 22, 2004, while A.B. was on Thanksgiving vacation and being evaluated at St. Francis,  Ms. Abbe sent C.D. a letter which stated that "[i]n response to

[A.B.]'s struggles with emotional issues and her hospitalization, we have placed [A.B.] on a medical leave of absence. In light of the fact that this is [A.B.]'s second, and again very serious, medical leave, she is required to be on a medical leave for at least the remainder of the academic year." The letter set forth a number of conditions for [A.B.]'s return to school, including:

    a.  Participation in on-going therapy during the leave of absence and the school year; therapy would be discontinued only with the agreement of Dr. Chu;

    b.  Execution of a standing and unconditional release for Dr. Chu to speak with A.B.'s treatment team;

    c.  Provision of written assurance from [A.B.]'s therapist of [A.B.]'s stable health status, and verification that [A.B.] is prepared to return to Walker and to engage fully in their program; and

    d.  Submission to evaluation by a psychiatrist (MD) before her return, who must agree with [A.B.]'s therapist and Dr. Chu to [A.B.]'s return and the follow-up treatment plan.

51.  Without the permission of A.B. or C.D., this letter was sent to Susanna Jones, Head of School, Dr. Chu, and Monica Nix, Dean of Studies.

52.  On Wednesday, November 24, 2005, before C.D. received the letter, Ms. Abbe told C.D. that the WalkerSchool was placing A.B. on medical leave until the fall of 2005. When asked about the appeal process, Ms. Abbe told C.D that there was no appeal process.

53.  The Walker School did not make any attempt to communicate with St. Francis Hospital to determine if A.B. was fit to return to school.

54. A.B. was discharged from St. Francis on Friday, November 26, 2004, the day after Thanksgiving, and was medically cleared to return to school. Her discharge plan included a partial hospitalization and outpatient program, which is an after school program, and follow-up visits with a new therapist.

55. A.B. had missed only one (1) day of school.

56. On November 30, 2004, St. Francis Hospital sent a letter to Ms. Abbe confirming that A.B. "was discharged Friday, November 26 as she did not meet criteria for hospitalization. At time of discharge, [A.B.] was not a danger to herself or others. She was discharged to her mother's care, with a continuity of care plan in place."

57. On December 2, 2004, C.D. and Molly Cole, Executive Director of Favor, Inc., a statewide family advocacy organization for children's mental health, met with Ms. Abbe, Dr. Chu, and Lee Zallinger, A.B.'s advisor andphysics teacher to see if A.B. could return to school as soon as possible so that she could take her exams and finish the school year at the Walker School..

58. In the meeting Ms. Abbe gave C.D. an undated copy of a Medical Leaves of Absence Policy. It stated that the Walker School is "not a therapeutic community and at times cannot maintain a student on campus. ... In certain cases a medical leave may be required of a student." The policy further stated that when a School or other psychological counselor and the Director of the Health Center "jointly conclude that a student has attempted suicide, has exhibited suicidal behavior or is at risk for attempted suicide, the School will require a leave of absence at least until the start of the following academic year." The policy also addressed conditions for return.

59. C.D. had never seen this policy before.  It was not included in any version of the Student Handbook.

60. At the meeting, Ms. Abbe refused to discuss A.B.'s medial clearance to return to school or any accommodation that would return A.B. to school before the fall of 2005.  Ms. Abbe would not even consider A.B. returning after January 1, 2005.

61. Ms. Abbe stated that "she was appalled" that A.B. had returned to school so soon after her first hospitalization.  She said that, in her experience, it is best to put lots of time and distance between school and hospitalizations of this kind.

62. Ms. Abbe suggested that C.D. find a school for A.B. that was "therapeutic;" Dr. Chu suggested one such school in South Carolina.  This suggestion was not based on any conclusions from A.B.'s treating therapist or St. Francis Hospital.

63. The decision to exclude A.B. from school until fall 2005 was not an individualized assessment of A.B. based on objective medical evidence.  It was based on prejudice and stereotypes.

64. On December 8, 2004, A.B. enrolled in the local public high school.  A.B. currently attends a new school and is adjusting socially to new classmates, teachers and classes, and making up class work.

65. From November 26, 2004 through December 30, 2004, A.B. attended the partial hospitalization program.  On December 30, 2004, A.B. was discharged from the partial hospitalization program, and is now seeing a new private therapist.

66. Due to discriminatory attitudes, fears and beliefs about depression, Defendant believed that A.B.'s depression was more severe than it was.

67. Defendant regarded A.B. as having a mental impairment that substantially limited one or more major life activity.

68. A.B. has a record of a mental impairment that substantially limited one or more major life activity. Defendant was aware of A.B.'s history of impairment.

69. A.B. is otherwise qualified to attend the Walker School, that is, she is and was able to meet all of the Walker School's academic, financial and disciplinary requirements with or without an accommodation for her disability.

70. The accommodation requested by C.D., continuation of A.B.'s enrollment at, and readmission in January 2005 to, the Walker School would not fundamentally alter the nature of the goods, services, facilities, privileges, advantages or accommodations offered by Defendant, nor would such an accommodation result in an undue burden on Defendant.

71. A.B. has been and continues to be denied enjoyment of the facilities and programs at the Ethel Walker School.

72. As a result of Defendant's unlawful, intentional, and willful actions described above, A.B. has suffered, continues to suffer, and will in the future suffer, great and irreparable loss and injury, including but not limited to loss of an educational opportunity, humiliation, embarrassment, and emotional distress.

73. In engaging in the unlawful conduct of denying A.B. access to the Walker School due to her history of mental illness or Defendant's perception of A.B. as a person with a disability, Defendant acted intentionally and maliciously to damage the rights and feelings of A.B.

74. Based on a reasonable medical judgment that relies on the most current medical knowledge and/or the best available objective evidence, and upon an individualized assessment of A.B., at the time of her both entering and leaving the hospital in November 2004, A.B. posed no risk of harm to herself or to others.

75. Defendant did not seek a reasonable medical judgment that relies on the most current medical knowledge and/or the best available objective evidence, or perform an individualized assessment of A.B.'s risk.

76. All of Defendant's actions set forth in this complaint were intentional.

### FIRST CAUSE OF ACTION

**Discrimination in a Public Accommodation
in Violation of the ADA
42 U.S.C. § 12181 et. seq.**

77. Plaintiff repeats the allegations of all of the above paragraphs as if fully set forth herein.

78. Defendant's actions and practices described above violate Title III of the Americans With Disabilities Act of 1990, as amended, 42 U.S.C. § 12181 et seq.

79. A.B. has a record of having a disability which substantially impaired a major life activity.  Defendant was aware of A.B.'s history of disability.

80. Defendant mistakenly believes that A.B.'s mental impairment currently substantially limits one or more of her major life activities such that A.B. is otherwise unqualified for attendance at its public accommodation.

81. Defendant's actions and practices described above constitute unlawful discrimination under 42 U.S.C. § 12182(a), in that Defendant has discriminated against A.B. on the basis of A.B.'s  record of disability or perceived disability, with regard to the full and equal

enjoyment of Defendant's goods, services, facilities, privileges, advantages, or accommodations. 42 U.S.C.A. § 12102(2)(b) and (c).

82. Defendant's actions and practices described above also constitute unlawful discrimination under the various subparts of 42 U.S.C. § 12182(b)(1)(A), including: § 12182(b)(1)(A)(i) (denial of the opportunity to participate in Defendant's services); § 12182(b)(1)(A)(ii) (offer of the opportunity to participate in unequal benefits); and § 12182(b)(1)(A)(iii) (failure to take steps to insure an individual with a disability is not excluded, denied services, segregated or otherwise treated differently).

83. Defendant's actions and practices described above also constitute unlawful discrimination under the various subparts of 42 U.S.C. § 12182(b)(2)(A), including: § 12182(b)(2)(A)(i) (imposition of eligibility criteria); § 12182(b)(2)(A)(ii) (failure to make reasonable modifications in policies, practices and procedures); and § 12182(b)(2)(A)(iii) (provision of separate benefits).

84. Defendant has excluded A.B. from participation in and denied her the opportunity to participate in or benefit from its programs, services and activities. Defendant has treated A.B. unequally compared to students that do not have a disability. Defendant has also used criteria and methods of administration that have the effect of subjecting A.B. to discrimination on the basis of her record of disability or perceived disability, and that have the purpose or effect of defeating or substantially impairing the accomplishment of the objective of its program with respect to individuals with disabilities and in particular with respect to A.B. Additionally, Defendant has failed to provide a reasonable accommodation under the Americans with Disabilities Act that would enable A.B. meaningful access to Defendant's services.

14

85. As a result of Defendant's violations of the Americans with Disabilities Act, A.B. was damaged, as detailed above.

## SECOND CAUSE OF ACTION

### Violation of Section 504 of the Rehabilitation Act of 1973

86. Plaintiff repeats the allegations of all of the above paragraphs as if fully set forth herein.

87. Defendant's actions and practices described above violate Section 504 of the Rehabilitation Act of 1973 as amended, 29 U.S.C. § 794 et seq. ("Section 504"). In particular, upon information and belief, Defendant Ethel Walker School is a primary and secondary school which receives Federal funds for the purposes of Section 504 of the Rehabilitation Act; Defendant in its actions and practices described above has discriminated against A.B., and excluded her from participation in, and denied her the benefits of, Defendant's programs, services and activities because of A.B.'s history of disability or perceived disability.

88. As a result of Defendant's violations of Section 504, A.B. was damaged, as detailed above.

## THIRD CAUSE OF ACTION

### Breach of Contract

89. Plaintiff repeats the allegations of all of the above paragraphs as if fully set forth herein.

90. C.D. signed a contract with the Ethel Walker School for the provision of educational services.

91. That contract included a Student Handbook which specified the procedures for addressing students with mental health needs. It provided that students with mental

health needs were referred to the Counseling Center and, if necessary, to an outside professional.

92. Defendant changed the terms of that Handbook for the 2004-2005 school year without the consent of the Plaintiff and without entering a new contract with Plaintiff. The revised Student Handbook required imposition of a mandatory leave of absence.

93. By imposing a mandatory leave of absence for the remainder of the academic year, Defendant breached the terms of the original Student Handbook.

94. Furthermore, even Defendant's revised Student Handbook contemplated an individualized assessment of A.B. and consideration of objective medical evidence in considering the length of the leave of absence. By relying on an unpublished policy to place A.B. on involuntary medical leave of absence for the remainder of the academic year without regard to the opinion of her treating therapist, Defendant breached the terms of the revised Student Handbook.

95. As a result, A.B. was damaged, as detailed above.

## FOURTH CAUSE OF ACTION

### State Common Law Invasion of Privacy

96. Plaintiff repeats the allegations of all of the above paragraphs as if fully set forth herein.

97. In diagnosing A.B., treating her, referring her for further evaluation, and by monitoring her progress, Dr. Chu became aware of individually identifiable health information about A.B.

98. Dr. Chu disclosed that information to Defendant's administrative and professional staff, including but not limited to the Dean of Students, the Head of School, the Dean of Studies, guidance counselors, professors and advisors.

99. Elinor Abbe, Dean of Students, also became aware of individually identifiable health information about A.B. Ms. Abbe further shared that information with other administrative and professional staff.

100. This information was shared without the consent of Plaintiff.

101. Therefore, Defendant violated A.B.'s rights to privacy under state law.

102. As a result, A.B. was damaged, as detailed above.

## FIFTH CAUSE OF ACTION

### Negligent Infliction of Emotional Distress

103. Plaintiff repeats the allegations of all of the above paragraphs as if fully set forth herein.

104. Defendant's conduct in the manner in which it removed and then expelled A.B. from school created an unreasonable risk of causing A.B. emotional distress.

105. A.B.'s distress was foreseeable.

106. The emotional distress caused was severe enough that it has resulted in pain, suffering, and a setting back of A.B.'s treatment.

107. Defendant's conduct was the cause of A.B.'s distress

108. Therefore, Defendant was negligent in its infliction of emotional distress on A.B.

109. As a result, A.B. was damaged, as detailed above.

## PRAYER FOR RELIEF

**WHEREFORE, Plaintiff prays:**

(a)     That the Court declare the actions of Defendant complained of herein to be in violation of the Americans With Disabilities Act of 1990, as amended, 42 U.S.C. § 12181 et seq, and Section 504 of the Rehabilitation Act of 1973;

(b)     That the Court find that Defendant Ethel Walker negligently inflicted emotional distress upon A.B., breached its contract with Plaintiff and violated A.B.'s state common law rights to privacy;

(c)     That Defendant, its  agents, employees, and successors be permanently enjoined from discriminating on the basis of disability against A.B. or any persons in violation of the aforementioned acts;

(d)     That Defendant Ethel Walker be ordered to restore A.B. to her status as a full-time day student;

(e)     That Defendant be ordered to take appropriate affirmative actions to ensure that the activities complained of above are not engaged in again by them;

(f)     That appropriate punitive and compensatory damages be awarded to Plaintiff and against Defendant;

(g)     That Plaintiff be awarded her costs and reasonable attorney's fees in this action; and

(h)     That Plaintiff be awarded such other further relief as the Court deems just and proper.

## JURY DEMAND

Pursuant to Fed. R. Civ. P. 38(b), trial by jury is demanded on all issues.

Dated: Stamford, Connecticut
May 27, 2005

Respectfully submitted,

OUTTEN & GOLDEN LLP

By: _____

Gary Phelan (CT 03670 )
Attorneys for the Plaintiff
Outten & Golden LLP
Four Landmark Square, Suite 201
Stamford, CT 06901
(203) 363-7888
Fax: (203) 363-0333

Ira Burnim
Karen A. Bower
The Judge David L. Bazelon Center for
   Mental Health Law
1101 15th Street, NW,  Suite 1212
Washington, DC  20005
(202) 467-5730
Fax: (202) 223-0409